Tanjula Moncrief Sankey, the mother, appeals from a Montgomery Circuit Court judgment transferring custody of her two children to Derrick E. Sankey, the father. The children at issue are a daughter, who was born in October 1996, and a son, who was born in February 2000.
In April 2002, the Montgomery Circuit Court entered a divorce judgment awarding the parties joint legal custody of their children, awarding the mother primary physical custody of the children, and awarding the father visitation. After the entry of the divorce judgment, the parties continued to reside in Montgomery, though the mother changed residences on one occasion.' In February 2004, the mother and the children moved to Stock-bridge, Georgia. In July 2004, they moved to Newnan, Georgia, which was closer to the father's home than Stockbridge. The father, who continued to reside in Montgomery, did not object to the mother's move to Stockbridge or her subsequent relocation to Newnan.
In November 2004, the mother filed a petition to modify the father's visitation rights because she planned to move from Georgia to Wichita Falls, Texas. The mother alleged that she planned to marry a member of the United States Air Force who was about to be reassigned to Wichita Falls. In addition to requesting a modification of the father's visitation rights, the mother requested that the trial court hold the father in contempt of court because he allegedly made negative comments about her to the children.
The father filed an answer denying the material allegations contained in the mother's petition. He also objected to the mother's planned relocation, as required under the Parent-Child Relationship Protection Act, Ala. Code 1975, § 30-3-160 et seq. ("the Relationship Protection Act").[1] The father alleged that the relocation of the children was not in their best interests. Further, he requested that the trial court hold the mother in contempt for allegedly violating the divorce judgment by speaking negatively to the children about him.
In May 2005, after an ore tenus proceeding, the trial court entered a 13-page order containing detailed findings about how the mother had not acted in the best interest of the children while they were in her custody and how she had interfered with the father's relationship with the children. The trial court determined that the mother had not "met her burden to overcome the presumption that the move to Texas is not *Page 898 
in the children's best interest." See Ala. Code 1975, § 30-3-169.4. Also, the trial court, citing T.B. v.C.D.L., 910 So.2d 794 (Ala.Civ.App. 2005), and Ex parteMcLendon, 455 So.2d 863 (Ala. 1984), stated that even if the mother had met her burden of proof and the burden of proof had shifted to the father, the father had "clearly demonstrated that a change in custody . . . would far outweigh the disruptive effects of such a change and that such a change in custody will clearly materially promote the children's best interests." The court awarded the father primary physical custody of the children, ordered the mother to pay child-support, and awarded the mother visitation.
The mother filed a postjudgment motion in which she argued that several of the trial court's findings of fact were not supported by the evidence. She requested that the trial court vacate its judgment and that it enter an order leaving custody of the children with her. After a hearing on the mother's postjudgment motion, the trial court denied her motion, stating, in part, that it had "determined from the evidence, testimonial and documentary, that the best interests of the children would be served and with a minimum of disruption to the children by changing physical custody to the father pursuant to theMcLendon standard." The mother appeals.
On appeal, the mother contends that the Relationship Protection Act is unconstitutional under both the United States Constitution and the Alabama Constitution. The mother never presented these arguments to the trial court, however, and we therefore do not consider them. See Andrews v. Merritt OilCo., 612 So.2d 409, 410 (Ala. 1992); see also M.R. v.State Dep't of Human Res., 587 So.2d 416, 417
(Ala.Civ.App. 1991) (holding that constitutional issues cannot be raised for the first time on appeal).
The mother also contends that the trial court abused its discretion by changing physical custody of the children to the father because, she says, the father had "unclean hands". The mother did not file a pleading alleging that the father should not be awarded custody of the children because he had unclean hands.[2] Likewise, she did not argue the doctrine of unclean hands at trial, and she did not raise the issue of unclean hands in her post-judgment motion. Thus, we cannot consider her unclean-hands argument. See Andrews, supra.
The only arguments by the mother that are properly presented to this court are whether the evidence supports the trial court's determinations that the mother failed to meet her initial burden of proof under the Relationship Protection Act and whether the father met his burden of proof under Ex parte McLendon.
As to the first argument, our legislature has stated that the Relationship Protection Act is intended to "promote[ ] the general philosophy in this state that children need both parents, even after a divorce, established in Section 30-3-150[, Ala. Code 1975]." Ala. Code 1975, § 30-3-160.[3] It is toward this central *Page 899 
purpose of the Relationship Protection Act that § 30-3-169.4
provides for "a rebuttable presumption that a change of principal residence of a child is not in the best interest of the child" and that the relocating parent has "the initial burden of proof on the issue." As noted above, the trial court concluded that the mother failed to satisfy her initial burden of proof and that the mother's failure to meet her burden would justify a change of custody without any consideration of the so-calledMcLendon standard.
The trial court further stated, however, that even if the mother had rebutted the presumption established in § 30-3-169.4, it still would have ordered the change of custody in favor of the father. In relation to this portion of the trial court's analysis, the trial court stated as follows:
 "Although . . . § 30-3-169.4 specifically states the standard for the Court under the . . . Relationship Protection Act is the `best interest of the child,' the Court of Civil Appeals has held that the standard enunciated in Ex parte McLendon, 455 So.2d 863
(Ala. 1984) is the correct standard. (See T.B. v. C.D.L., [910 So.2d 794 (Ala.Civ.App. 2005)])
 Therefore, in reaching the custody decision set forth below in compliance with § 30-3-169.3, this Court has done so pursuant to the more stringent McLendon standard."
Section 30-3-169.3(a), Ala. Code 1975, states:
 "In determining whether a proposed or actual change of principal residence of a minor child should cause a change in custody of that child, a court shall take into account all factors affecting the child, including, but not limited to, the following:
 "(1) The nature, quality, extent of involvement, and duration of the child's relationship with the person proposing to relocate with the child and with the non-relocating person, siblings, and other significant persons or institutions in the child's life.
 "(2) The age, developmental stage, needs of the child, and the likely impact the change of principal residence of a child will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child.
 "(3) The increase in travel time for the child created by the change in principal residence of the child or a person entitled to custody of or visitation with the child.
 "(4) The availability and cost of alternate means of communication between the child and the non-relocating party.
 "(5) The feasibility of preserving the relationship between the non-relocating person and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.
 ". . . .
 "(7) The degree to which a change or proposed change of the principal residence of the child will result in uprooting the child as compared to the degree to which a modification of the custody of the child will result in uprooting the child.
 "(8) The extent to which custody and visitation rights have been allowed and exercised.
 "(9) Whether there is an established pattern of conduct of the person seeking to change the principal residence of a child, either to promote or thwart the relationship of the child and the non-relocating person.
 "(10) Whether the person seeking to change the principal residence of a *Page 900 
child, once out of the jurisdiction, is likely to comply with any new visitation arrangement and the disposition of that person to foster a joint parenting arrangement with the non-relocating party.
 "(11) Whether the relocation of the child will enhance the general quality of life for both the custodial party seeking the change of principal residence of the child and the child, including, but not limited to, financial or emotional benefit or educational opportunities.
 "(12) Whether or not a support system is available in the area of the proposed new residence of the child, especially in the event of an emergency or disability to the person having custody of the child.
 ". . . .
 "(14) The stability of the family unit of the persons entitled to custody of and visitation with a child.
 "(15) The reasons of each person for seeking or opposing a change of principal residence of a child."
Prior to the enactment of the Relationship Protection Act, our Supreme Court stated as follows in Ex parte McLendon:
 "`[T]he party seeking modification [must] prove to the court's satisfaction that material changes affecting the child's welfare since the most recent decree demonstrate that custody should be disturbed to promote the child's best interests. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child.'"
455 So.2d at 865-66 (quoting Wood v. Wood 333 So.2d 826,828 (Ala.Civ.App. 1976)).[4]
The judgment was issued based upon ore tenus proceedings. Where the trial court's findings are based on evidence received oretenus,
 "`[o]ur standard of review is very limited. . . . A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, . . . and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow.'" *Page 901 
Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994) (citations omitted) (quoting Phillips v. Phillips,622 So.2d 410, 412 (Ala.Civ.App. 1993)). "It is our duty to affirm the trial court's judgment if it is fairly supported by credible evidence, `regardless of our own view of that evidence or whether we would have reached a different result had we been the trial judge.'" Griggs v. Griggs, 638 So.2d 916, 918-919
(Ala.Civ.App. 1994) (quoting Young v. Young,376 So.2d 737, 739 (Ala.Civ.App. 1979)).[5]
Much of the same evidence supports both the trial court's determination that the mother failed to rebut the presumption under § 30-3-169.4 that relocation of the children to Texas would not be in their best interest and its determination that, even if the mother had rebutted that presumption, the father met his burden of proof under Ex parte McLendon. The mother presented testimony that she was the children's primary caregiver; that, as of the time of trial, she had remarried; and that she had visited the school that the children would attend in Wichita Falls. The mother presented no evidence about the quality of the Wichita Falls school, as compared to the schools in Newnan or Montgomery. Likewise, the mother presented no evidence about the type of relationship the children had with the mother's husband. Other than inferences that the trial court could have drawn, but was not required to draw, from the fact that the mother had been the children's primary caregiver, there was no evidence that the children's interests would be furthered by the proposed relocation to Wichita Falls.
In the three years between the parties' divorce and the time of trial, the mother has moved on three occasions and the parties' daughter, the only school-age child at the time of the respective moves, has attended three different schools. The record would support findings that the father has a close relationship with the children; that the children were always excited to see him; and that they sometimes did not want to return to their mother after visitation. Furthermore, the record would support findings (1) that the father encourages and supports the children's relationship with the mother, but that the mother consistently attempts to harm the father's relationship with the children, and (2) that the mother has entertained overnight guests of the opposite sex when the children were with her. Also, the record would support findings that, based on the behavior of the mother since the entry of the divorce judgment in 2002, the quantity and quality of the children's contact with both parents would be better served by the children remaining in Alabama with the father, rather than allowing the mother to relocate the children a fourth time.
We further note that there was evidence that the mother acted inappropriately in the children's presence. For example, as the trial court specifically found in its judgment, on one occasion the father contacted
 "the Opelika Police Department for assistance in insuring that [his] return of the children to the [mother] was smooth and/or uneventful.
 "Officer Preston met the [father] and the children at the last Opelika exit, . . . arriving before the [mother]. The [mother] became angry when she saw a police officer with the [father]. Officer Preston's undisputed testimony was that the [mother] jerked the children out of *Page 902 
the [father's] vehicle and put them in her vehicle while the children were attempting to say goodbye to their father. She then walked back to continue her angry, loud outburst directed to both Officer Preston and the [father], which included such statements as `We're moving to Texas soon' and `You'll never see your Daddy again.' Officer Preston stated that the [mother] was so loud that it is likely that the children heard, as well as watched, their mother's out-of-control behavior."
In addition, it is undisputed that the children have close relationships with both paternal and maternal relatives who reside in the Montgomery area and that those relationships would suffer as a result of a relocation to Texas. In particular, we note that the father resides on the same property as the children's paternal grandparents, though not in the same home, and that the children would be returning to the home where they lived for the last few years of the parties' marriage. Also, the trial court specifically found that the children "have maintained school and church friendships with other children in Montgomery with whom they interact of a regular basis." By contrast, the trial court noted that it could
 "find no evidence that a move to Wichita Falls, Texas, will materially promote the children's educational, cultural, or psychological well being. Indeed, it appears that quite the contrary is the case. The children will be removed from all persons and things which are familiar to them and placed in a setting with only the [mother] for support. There was no evidence that these children have a relationship, parental or otherwise, with the [mother's] new husband and no evidence that the new husband is capable of fostering any such relationship.
 ". . . [I]t was undisputed that the children do have a close relationship with [the father's wife], their stepmother, and her two sons."
 ". . . .
 "With either move, the children will be uprooted from their Newnan, Georgia, home. The lesser of the disruptions will be to place the children in the custody of their father where they will have familiar persons, familiar homes and familiar things for support and in which to grow and develop. To allow the children to relocate to Texas where they have no support, no family, no emotional ties and no improved quality of life is not in their best interests, and such a move cannot overcome the disruption to them. In addition, it appears likely that the [mother's] behavior pattern regarding her continuing interference with visitation and her lack of encouragement in promoting the father-child relationship will be exacerbated by a move to Texas.
 ". . . [A] change in physical custody to the [father] will materially promote the children's best interests, and the benefits of such a change to the [father's] custody will outweigh any disruption caused by the change in custody."
The father, who is a deacon for his church, is employed as a youth services aid for the Autauga Department of Youth Services. He is a favorite counselor of the children who are at the facility; the children report that he is both fair and responsive to their needs. The father works for Youth Services from 6:00 a.m. until 2:00 p.m., Sunday through Thursday. At the father's request, Youth Services had made adjustments to his work schedule to accommodate his visitation with his children.
The father also works part-time for O'Reilly Auto Parts. However, he arranged his work schedule so that it did not *Page 903 
interfere with visitation with his children. The father testified that he intended to quit his job at O'Reilly's if the court awarded him custody of the children. He stated that the family could still "make it financially" if he quit- his part-time job.
The father is married, and his wife has one son from a previous marriage. The father's current wife has custody of both this son and a male cousin; those children are 10 years old and 11 years old, respectively. The testimony at trial reflects that the father's children treat the father's wife "like she is their mother" and that the father has a good relationship with his wife's son and cousin. The wife's son and cousin treat the father's children like they are siblings. The children each have a bedroom in the father's home.
Based on the foregoing, and the presumption that attends theore tenus rule, we cannot conclude that the trial court erred as to the modification of custody. The trial court's judgment is therefore due to be affirmed.
AFFIRMED.
CRAWLEY, P.J., and PITTMAN and BRYAN, JJ., concur.
THOMPSON, J., concurs in the result, without writing.
[1] Although the mother and the children reside in Georgia, § 30-3-169.9(b), Ala. Code 1975, states:
 "Where the parties have been awarded . . . joint legal custody . . . of a child as defined in Section 30-3-151
and at least one parent having . . . joint legal custody . . . of a child continues to maintain a principal residence in this state, the child shall have a significant connection with this state and a court in fashioning its judgments, orders, or decrees may retain continuing jurisdiction under Sections 30-3B-202 to 30-3B-204, inclusive, even though the child's principal residence after the relocation is outside this state."
[2] In addition to her visitation-modification request, the mother pleaded that the father had violated the divorce judgment by not making certain payments for the children's health expenses. She asserted that this was grounds to hold him in contempt, but she never pleaded or argued that it was grounds which would prevent a custody award to him.
[3] Section 30-3-150, Ala. Code 1975, states:
 "It is the policy of this state to assure that minor children have frequent and continuing contact with parents who have shown the ability to act in the best interest of their children and to encourage parents to share in the rights and responsibilities of rearing their children after the parents have separated or dissolved their marriage."
[4] A majority of this court has expressed the view that theMcLendon standard continues to be applicable to cases otherwise governed by the Relationship Protection Act. SeeClements v. Clements, 906 So.2d 952 (Ala.Civ.App. 2005);T.B. v. C.D.L., 910 So.2d 794 (Ala.Civ.App. 2005). Recently, however, the author of this opinion expressed a contrary view. See Toler v. Toler, 941 So.2d 416 (Ala.Civ.App. 2006) (Murdock, J., concurring specially). The issue of McLendon's continued viability in cases otherwise governed by the Relationship Protection Act is not presented in the present appeal. Also not presented in this appeal is the issue whether the trial court, in reliance upon this court's opinion in T.B. v. C.D.L., supra, improperly applied the McLendon standard in relation to the other factors prescribed in § 30-3-169.3. Neither party takes issue with the dual analysis in which the trial court engaged. In particular, the mother does not challenge the view embodied in the trial court's analysis that, had the mother met her burden of proof under § 30-3-169.4 (that is, had the mother rebutted the presumption that a change of the child's principal residence would not be in the child's best interest), the trial court was then to examine the case under theMcLendon standard rather than based upon all of the factors prescribed in § 30-3-169.3. We therefore analyze the case using the same analytical approach as was used by the trial court.
[5] In the mother's McLendon argument, she essentially requests that this court reweigh conflicting testimony and that we make credibility determinations that would be contrary to those findings that would support the trial court's judgment. The mother also makes some assertions that are not supported by the record.